**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| WE THE PATRIOTS, INC.<br>JAMES CHILDS,<br><br>Plaintiffs,<br><br>v.<br><br>PENDER MAKIN, her official capacity only;<br>CARI MEDD, in her official capacity only,<br><br>Defendants. | Case No. 2:26-cv-00369-SDN |

**DEFENDANT MAKIN'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pender Makin, Commissioner of the Maine Department of Education (Maine DOE), ("Commissioner"), hereby opposes the Motion for Temporary Restraining Order and Preliminary Injunction ("TRO/PI") filed by Plaintiffs We the Patriots, Inc. and James Childs. ECF No. 18.

Maine's school vaccination laws are critical public health measures enacted to protect students and the wider community from vaccine preventable diseases. Not only are Plaintiffs unlikely to succeed on the merits of their case, their unjustified delay in bringing this motion does not warrant the extraordinary relief they seek. The Court should deny Plaintiffs' motion.

**STATUTORY BACKGROUND ON MANDATORY IMMUNIZATIONS**

For nearly 50 years, Maine has required that parents immunize their children against several childhood diseases in order to attend any public or private elementary or secondary school in the State. P.L. 1977, ch. 471 (eff. Oct. 24, 1977); 20-A M.R.S.A. §§ 6352-58 (2025 & Supp. 2026) (current codification). When the legislation was introduced, the Maine Legislature was concerned with the "large number of Maine children entering school without [the] benefit of basic immunization against childhood diseases" which "constitute[d] a serious threat to themselves and to others." Statement of Fact, L.D. 1264 (108th Legis.). *See also* 2 Me. Legis. Rec. 1974 (1977) (noting outbreaks of "various childhood communicable diseases" in Maine and across the country).

To protect children from childhood diseases, the Maine Legislature chose to require that all elementary and secondary school children attending public and private schools be immunized against vaccine-preventable childhood diseases. The diseases against which children must be vaccinated are now designated in rules jointly promulgated by the Maine DOE and the Maine Department of Health and Human Services. P.L. 2001, ch. 326, §§ 1, 3 (eff. Sep. 21, 2001); *see also* Immunization Requirements for School Children, 05-071 Me. Code R. ch. 126, §§ 1(A)(4), 2(A) (2026); 10-144 Me. Code. R. ch. 261, §§ 1(A)(4), 2(A) (2026) ("Immunization Rule") (designating diseases against which parents much immunize their children).

In 2019, the State of Maine again faced declining vaccination rates amongst elementary and secondary school children. At the time, there were three statutory exemptions to school entry vaccination requirements: when vaccination was (A) medically inadvisable, (B) contrary to a sincerely held religious belief, or (C) opposed for philosophical reasons.[1] 20-A M.R.S.A. §§ 6355(2), (3) (2008). By 2019, statewide exemption rates had increased to 6.2% for kindergarten students; 4.7% for seventh grade students; and 5.1% for twelfth grade students. Shiminski Dec. ¶ 36. County rates of exemptions ranged from 3.4% to 10.9% for kindergarten students; 1.1% to 9.0% for seventh grade students; and 3.1% to 12.7% for twelfth grade students. *Id.*

In response, the Maine Legislature passed "An Act To Protect Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions from the Laws Governing Immunization Requirements," P.L. 2019, ch. 154 ("Chapter 154"), which, among other changes, repealed the philosophical and religious exemption provisions to the State's school entry vaccination requirements. *See id.* at § 1, 12. The Maine Center for Disease Control and Prevention (Maine CDC) supported Chapter 154 and the elimination of nonmedical exemptions to school entry vaccination requirements.[2]

Legislative debate on Chapter 154 demonstrates that in eliminating these non-medical exemptions, the Maine Legislature was seeking to protect the health and safety of Maine students and the broader public, including vulnerable persons, from vaccine preventable diseases.[3] After

---

[1] In addition, the statute included a grace period provision that permits students to attend school for up to 90 days while they were coming into compliance with one or more vaccination requirements. 20-A M.R.S.A. § 6355(1) (2008).

[2] *L.D. 798: Hearing Before the J. Standing Comm. on Educ. & Cultural Affairs*, 129th Legs. (2019) (testimony of Nancy Beardsley), *available at* https://legislature.maine.gov/backend/app/services/getDocument.aspx?doctype=test&documentId=111948.

[3] *See* H. Journ. & Legis. Rec. H-393 to -394, H-397 & H-398 (1st Reg. Sess. 2019) (statements of Rep. Tipping, Rep. Ingwersen, and Rep. McDonald); S. Leg. Rec. S-557 & S-563 (1st Reg. Sess. 2019) (statements of Sen. Millett); H. Journ. & Leg. Rec. H-492 (1st Reg. Sess. 2019) (statement of Rep. Fecteau); S. Leg. Rec. S-651 to -652 (1st Reg. Sess. 2019) (statement of Sen. Sanborn); H. Journ & Legis. Rec. H-595 to -596 (1st Reg. Sess. 2019 (statements of Rep. McDonald and Rep. Tipping); S. Leg. Rec. S-651 to

withstanding a People's Veto attempt under the Maine Constitution in March of 2020, *see* Me. Const. art. IV, pt. 3, § 17, the portions of the law that eliminated non-medical exemptions for elementary and secondary school entry vaccine requirements went into effect on September 1, 2021. P.L. 2019, ch. 154 §§ 1, 12 (eff. Sep. 1, 2021).

The elimination of nonmedical exemptions for certain students with individualized education plans (IEPs)[4] was accomplished through a sunset provision. Under the IEP sunset, a student covered by an IEP as of September 1, 2021, and who previously had claimed a nonmedical exemption to the State's school vaccination requirements, could continue to qualify for and claim that nonmedical exemption. 20-A M.R.S.A. § 6355(4) (2025). As time passes, the number of students utilizing the IEP sunset will decrease, eventually to zero.

## FACTUAL BACKGROUND

Plaintiff James Childs is the father to G.C. Complaint, ECF No. 1 ("Compl.") ¶ 3; Cari Medd Declaration, ECF No. 27 ("Medd Dec.) ¶¶ 9-10. G.C. has received all required vaccinations for attendance through 6th grade, but to date he has not received vaccinations required for 7th grade students. Medd Dec. ¶¶ 9-10.

In September of 2025, G.C. was permitted to begin 7th grade at Tripp Middle School, a 7th and 8th grade school in Maine School Administrative District 52 ("District"), because his mother provided written assurance that G.C. would be vaccinated within 90 days. Medd Dec. ¶ 12. Over the next year, G.C.'s parents continued to assure the District that G.C. would be vaccinated by the start of 8th grade year. *See* Medd. Dec. ¶¶ 12-20. District Superintendent Cari Medd made

-652 (1st Reg. Sess. 2019) (statement of Sen. Sanborn); S. Leg. Rec. S-754 (1st Reg. Sess. 2019) (statement of Sen. Sanborn).

[4] An IEP is a written statement developed for a child with a disability that includes, among other things, a statement of accommodations. *See* 20 U.S.C.A. §§ 1401(14), 1414(d)(1)(A)(VI) (Westlaw, through Pub. L. No. 119-12).

clear to Childs and G.C.'s mother that G.C. would not be permitted to attend 8th grade without the necessary vaccination or proof of an exemption. Medd Dec. ¶ 20.

On July 16, 2026, Childs and We the Patriots, Inc. ("WTP") filed a complaint against the Commissioner and Superintendent Medd challenging Maine's school vaccination law under the First Amendment.[5] Compl. ¶ 6. Childs alleges that he has religious objections to vaccinating G.C., Compl. ¶¶ 1, 40, and Plaintiffs assert that Maine's mandatory school vaccination laws violate the Establishment Clause and the Free Exercise rights of Childs and WTP's members. Compl. ¶¶ 45-69. Nearly four weeks after filing their complaint, Plaintiffs moved for a temporary restraining order and a preliminary injunction. ECF No. 18.

**STANDARD OF REVIEW**

"The standard for issuing a temporary restraining order is the same as for a preliminary injunction and is provided by traditional equity doctrines." *Doe v. Portland Pub. Schs.*, 701 F. Supp. 3d 18, 32 (D. Me. 2023). "In deciding whether to issue a preliminary injunction, a court weighs four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Brox v. Woods Hole*, 164 F.4th 37, 42 (1st Cir. 2026) (cleaned up). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

[5] WTP asserts that it is a nonprofit organization "dedicated to promoting constitutional rights" and "advancing religious freedom, medical freedom, parental rights, and educational freedom for all." Compl. ¶ 2. Childs is a member of WTP, and WTP claims it has other Maine members affected by Maine's mandatory school vaccination laws. Compl. ¶¶ 2-3.

## ARGUMENT

### I. Plaintiffs are unlikely to succeed on the merits of their Free Exercise claims.

"The First Amendment's Free Exercise Clause, as incorporated against the states by the Fourteenth Amendment, protects religious liberty against government interference." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021), *cert. denied.* 142 S. Ct. 1112 (2022). However, not every law that "incidentally burdens free exercise rights" is subject to strict scrutiny. *Id.* "The standard of scrutiny that governs judicial review hinges on whether the government action at issue is religiously neutral and generally applicable." *Brox*, 164 F.4th at 42 (cleaned up).

"When a religiously neutral and generally applicable law incidentally burdens free exercise rights," it will be sustained "against constitutional challenge if it is rationally related to a legitimate governmental interest." *Mills*, 16 F.4th at 29; *accord Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). "Conversely, if a law is not neutral or generally applicable, then it is subjected to strict scrutiny and must be 'justified by a compelling state interest and ... narrowly tailored in pursuit of that interest.'" *Brox*, 164 F.4th at 42 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022)). Plaintiffs concede that "Defendants will likely prevail" under rational basis review. TRO/PI at 3.

#### A. Maine's school entry vaccination law is generally applicable because none of the challenged categories are comparable to religious exemptions.

The First Circuit has summarized the standard for general applicability in the context of mandatory vaccine requirements. *See Lowe v. Mills*, 68 F.4th 706, 714-16 (1st Cir. 2023). A law is not generally applicable if it "treat[s] <u>any</u> comparable secular activity more favorably than religious exercise." *Id* at 714 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam)). "'[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue,' and that

'[c]omparability is concerned with the risks various activities pose.'" *Id.* When Maine eliminated non-medical exemptions in 2019, it did so to protect the health and safety of Maine students and the broader public, including medically vulnerable persons, from vaccine preventable diseases.[6]

Importantly, in this general applicability analysis "[t]he question is not whether the risks associated with one individual who for religious reasons is unvaccinated are comparable to those associated with an individual who remains unvaccinated due to health concerns."[7] *Brox*, 164 F.4th at 47 (emphasis added). In evaluating whether the risks of different "types of exemption" are "comparable," the First Circuit has identified a non-exhaustive list of reasons why two types of exemptions are *not* comparable. *Lowe*, 68 F.4th at 715. Secular exemptions could be "rarer, more time limited, or more geographically diffuse than religious exemptions, such that the two exemptions would not have comparable public health effects." *Id.*

**1. None of the categories Plaintiffs challenge is comparable to a religious exemption.**

Plaintiffs do not cite or grapple with *Brox* or *Lowe*, instead solely relying on a numerical analysis of publicly available aggregated data. TRO/PI at 13-17. The Commissioner agrees that the number of students claiming a particular exemption is a relevant consideration, but it is not the only consideration. *See Lowe*, 68 F.4th at 715. Applying *Brox* and *Lowe*, none of the categories Plaintiffs challenge is comparable to a religious exemption.[8]

Grace period provision. Maine's school vaccination laws include a grace period provision that permits a child to attend school when they have not provided proof of immunity and are not vaccinated fully against one or more diseases specified for school entry, provided that the child's

---

[6] *See generally,* n.3*, supra.*
[7] Plaintiffs' one sentence argument to the contrary is thus meritless. TRO/PI at 13.
[8] *Tandon* instructs that a secular activity and a religious activity are compared in the aggregate, not at the individual level. 593 U.S. at 62.

parent provides a written assurance that the child will be immunized within 90 days or consents to the child's immunization by an authorized public health official or medical provider. *See* 20-A M.R.S.A. § 6355(1). By rule, the grace period is a one-time provision. Immunization Rule, § 3(A)(1). "If, after 90 days have passed, the parent fails to provide the required certificate of immunization, a medical exemption in accordance with 20-A M.R.S. § 6355(2), or proof of immunity against each of the diseases listed in this rule (as applicable), then the superintendent must exclude the student from school." *Id.*

The grace period provision is not comparable to a religious exemption. First, the 90-day grace period is a time-limited period of attendance to provide proof of immunization. *See Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1179 (9th Cir. 2021), *reconsideration en banc denied*, 22 F.4th 1099 (9th Cir. 2022). Religious exemptions are durable—they continue longer than the 90 days of the grace period. Blaisdell Dec. ¶ 28. The grace period provision is also a one-time provision for 90 days, Immunization Rule, § 3(A)(1), whereas religious exemptions continue year over year. *See* Blaisdell Dec. ¶ 28. Second, a child may be fully vaccinated against some diseases but not others and utilize the statutory grace period to become fully vaccinated. Blaisdell Dec. ¶ 28. Third, parents must commit to vaccinating their child during that 90-day period, which facilitates vaccination generally, thereby bolstering the State's interest in a safe and healthy school environment in a way that religious exemptions do not. *See San Diego Unified*, 19 F.4th at 1179. Fourth, some immunity (while not maximal immunity) is conferred with a single dose of vaccine, which can provide some protection during the 90-day grace period. Blaisdell Dec. ¶ 28. Students claiming a religious exemption will not have similar protection during that time frame.

Last, the 90-day period is tailored to the Immunization Rule, which specifies the number of and spacing between doses. *See e.g.*, Immunization Rule §§ 5(C)(2), (D)(2) (four weeks between doses of MMR and polio vaccines); *id.* § 5(F)(2) (eight weeks between doses of

meningococcal meningitis vaccine). The 90-day period allows for multiple doses of vaccines to be spaced in accordance with the Immunization Rule. Blaisdell Dec. ¶ 28. *See also San Diego Unified*, 19 F.4th at 1179 n.6 (noting "currently enrolled students" received a grace period of nearly 90 days to receive two doses of a COVID-19 vaccine "and provide documentation of those vaccinations"). And, students who do not comply with the requirements of the grace period must be excluded from school. Immunization Rule, § 3(A)(1). This "time-limited" and one-time exemption is not comparable to religious exemptions. *See Lowe*, 68 F.4th at 715.

IEP sunset provision. Under the IEP sunset provision, certain students with IEPs in place as of September 1, 2021, are exempt from the school vaccination requirements, provided they had previously claimed a nonmedical exemption. *See* 20-A M.R.S.A. § 6355(4). In order to continue to claim that nonmedical exemption, a student or the student's parent must submit a signed statement from a physician indicating that the physician explained the risks and benefits of vaccination to the student or the student's parent. *See id.* (exempting qualifying students with IEPs from school vaccination requirements). Students with IEPs in place after September 1, 2021, do not qualify for this provision. *Id.*

The IEP sunset provision is not comparable to religious exemptions. The record shows that the number of children in kindergarten, seventh grade, and twelfth grade claiming the IEP sunset provision in the 2023-2024, 2024-2025, and 2025-2026 school years is significantly fewer than the number of students in those grades claiming a religious exemption before September 1, 2021. Shiminski Dec. ¶¶ 44-46, 49-51. And the number of students claiming the IEP exemption in those three grade levels has declined by more than 70%, from 111 in 2021-2022 to 31 in the 2025-2026 school year. *See* Shiminski Dec. ¶¶ 47, 51. Over time, the number of students claiming the IEP sunset provision will decrease to zero, as qualifying students age out of Maine schools. In fact, in each of the 2024-2025 and 2025-2026 school years, fewer than (2) kindergarten students

claimed the IEP sunset provision. Shiminski Dec. ¶ 50-51. Because fewer students already are claiming the IEP sunset provision than had previously claimed the religious exemption, the two exemptions are not comparable. *See Hochul*, 17 F.4th at 287.

Medical exemption. The medical exemption to Maine's school vaccination requirements allows that child to attend school upon providing "a written statement from a licensed physician, nurse practitioner or physician associate that, in the licensed physician's, nurse practitioner's or physician associate's professional judgment, immunization against one or more of the diseases may be medically inadvisable." 20-A M.R.S.A. § 6355(2). Joint guidance from Maine CDC and Maine DOE specifies that the required written statement must be provided by a Maine-licensed physician, nurse practitioner, or physician associate. Ex. 11 at 2; *see also* Immunization Rule, summ. ("For the purpose of complying with this rule, 'licensed' physicians, nurse practitioners and physician associates mean licensed by the State of Maine.").

Medical exemptions are not comparable to religious exemptions for at least four reasons.

*First*. Medical exemptions are qualitatively different than religious exemptions. Medical exemptions further the State's interest in protecting the health and safety of Maine students and the broader public, including medically vulnerable persons, from vaccine preventable diseases. *See* Blaisdell Dec. ¶¶ 19; Benowitz Dec. ¶¶ 20-22. "Medical classifications and exemptions are an inescapable part of health regulation, and they generally exist to advance the state's health interests, not to undermine them." *Perry v. Marteney*, 172 F.4th 315, 326 (4th Cir. 2026). Certain vulnerable groups cannot be vaccinated, such as the young, the immunocompromised, those who are pregnant, and the elderly. Blaisdell Dec. ¶¶ 8, 19. Medical exemptions protect the health of individuals when the risk of vaccine does or could outweigh the risk of illness itself. Benowitz Dec. ¶ 21.

*Second*. The nature of diseases and/or diagnoses requiring medical exemptions from

vaccines are uncommon and stable in prevalence or incidence. Blaisdell Dec. ¶ 21. Given the small number of medical exemptions attributable to these diagnoses, one can predict that unvaccinated children in school with this type of medical exemption would likewise be small and stable year on year. Blaisdell Dec. ¶ 21. Indeed, statewide rates of medical exemptions in Maine have been stable , never peaking higher than 1.5% for kindergarten students in the 2021-2022 school year.[9] Shiminski Dec. ¶¶ 52-61; *see also* Blaisdell Dec. ¶¶ 9, 17 (immunization rates of 95% or greater is the accepted public health goal).

Because medical exemptions must be verified by a Maine-licensed physician, nurse practitioner, or physician assistant, Ex. 11 at 2*;* Immunization Rule, summ., licensing consequences are an important check on their usage. Governmental and medical experts provide recommendations for medical exemption indications, and those recommendations are considered standard practice in medicine. Blaisdell Dec. ¶ 19. If a physician, nurse practitioner, or physician associate engages in conduct that violates relevant standards of care, such as writing a medical exemption without an evidence-based medical reason and any required assessment or examination of the patient, Maine licensing boards can take, and indeed have taken,[10] action against those practitioners. *See* 32 M.R.S.A. § 3282-A(2)(E), (F) (2020) (physicians (M.D.s) or physician associates); 32 M.R.S.A. § 2591-A(2)(E), (F) (2020) (physicians (D.O.s) or physician associates); 32 M.R.S.A. § 2105-A(2)(E), (F) (2020) (nurse practitioners).

---

[9] Further, the data on the number of medical exemptions includes students with temporary medical exemptions on vaccine-catch up schedules. Shiminski Dec. ¶ 17. In other words, the figures for students are "medically exempt" include students who are in the process of becoming fully vaccinated on an alternate vaccination schedule.

[10] In 2022, the Maine Board of Osteopathic Licensure, which licenses medical and osteopathic physicians with D.O.s and certain physician assistants, disciplined a doctor for issuing medical exemption letters for vaccines without examining the patients or keeping accurate records. *See In Re: Paul G. Gosselin*, No. 2021-49 at 13-15 (Maine Board of Osteopathic Licensure Aug. 12, 2022), *available at* https://www.pfr.maine.gov/ALMSOnline/ALMSQuery/ShowCaseDetail.aspx?SearchResultToken=3A9A98721436332C60AC2775BBD574B3997C083C0E8661C36927F83E76BCC026.

In contrast, nonmedical exemptions (NMEs) lack objective constraints, which allows for unpredictable and unchecked increase in usage. Blaisdell Dec. ¶ 24. NMEs kept increasing in Maine, such that by 2018-2019, the statewide rate of NMEs had increased to 5.6% for kindergarten students; 4.6% for seventh grade students; and 5.0% for twelfth grade students. Shiminski Dec. ¶ 37. In Maine, the total number of religious exemptions reported more than doubled between the 2018-2019 and 2019-2020 school years. *See* Shiminski Dec. ¶¶ 44-45. Left unchecked, NMEs increased steadily from 3.5% to 5.6% over 2011-2019; in 2018-19, average kindergarten NMEs rate in the 16 counties in Maine ranged from 3.4% to 10.4%, with 73 of 341 (21%) of schools with kindergarten classes reporting total NMEs rates of equal to or greater than 10%. Blaisdell Dec. ¶ 24. Across the country, religious exemptions have steadily increased in states that permit a religious exemption, but not a philosophical exemption, to kindergarten school entry vaccination requirements. Blaisdell Dec. ¶ 26.

*Third.* Nonmedical exemptions (NMEs), including religious exemptions, cluster in social and spatial manner. Blaisdell Dec. ¶¶ 23, 27. This was born out in Maine in 2018-2019 school year, which was the most recent data available to the Maine Legislature when it was considering Chapter 154. Blaisdell Dec. ¶ 23; Shiminski Dec. ¶ 35. In that school year, NMEs for kindergartens in Maine demonstrated significant clustering in both rural (less populated) and urban (more populated) settings. Blaisdell Dec. ¶ 23, chart 4(b). In contrast, in the same 2018-19 school year, medical exemptions for kindergartens in Maine were stable across the State. Blaisdell Dec. chart 4(a). Thus, medical exemptions are generally more "geographically diffuse" than NMEs, including religious exemptions. *See Lowe*, 68 F.4th at 715.

*Fourth*. When access to a philosophical exemption is eliminated, religious exemptions increase, demonstrating that parents or students can easily shift from claiming a philosophical exemption to claiming a religious exemption. Blaisdell Dec. ¶ 25. For example, prior to 2016,

Vermont permitted three types of vaccine exemptions to school entry: medical, philosophic, and religious. Blaisdell Dec. ¶ 25. When Vermont law changed to eliminate the philosophical exemption for school entry in 2016, the number of religious exemptions claimed for K-12 enrollment increased more than 400%, from 494 in the 2015-2016 school year, to 2,546 in the 2016-2017 school year. Blaisdell Dec. ¶ 25. Vermont provides a clear example as to why public health goals of achieving a widely vaccinated population above threshold levels is difficult, if not impossible, when one or both types of NMEs (religious and/or philosophical) are in place.[11] Blaisdell Dec. ¶ 26.

**2. Plaintiffs' arguments to the contrary are unpersuasive.**

Plaintiffs, for their part, challenge Maine's laws based largely on statewide aggregate data. TRO/PI at 13-15. The Court should reject these arguments as overly simplistic, misleading, and contrary to *Lowe*.

First, Plaintiffs note that statewide, the percentage of kindergarten students claiming medical exemptions exceeded the percentage of kindergarten students claiming religious exemptions in 2 out of 3 preceding years before 2021. TRO/PI at 14-15. Plaintiffs leave out, of course, that during the same time period, the statewide percentage of seventh and twelfth grade students claiming religious exemptions vastly exceeded the percentage of seventh and twelfth grade students claiming medical exemptions, with the exception of one year when it was the same. TRO/PI at 14. Further, Plaintiffs' simplistic argument comparing statewide percentages of religious versus medical exemptions ignores *Lowe*. TRO/PI at 15. Unlike medical exemptions, NMEs (including religious exemptions), tend to cluster in a social and spatial manner. Blaisdell

[11] The number of religious exemptions claimed for K-12 enrollment in Vermont for the 2014-2015 and 2015-2016 school years was 162 and 494, respectively; the number of philosophic exemptions claimed for K-12 enrollment in Vermont for the 2014-2015 and 2015-2016 school years was 3,566 and 3,109, respectively. Blaisdell Dec. ¶ 25, Tbl. 2.

Dec. ¶¶ 23, 27. Medical exemptions thus are generally more "geographically diffuse" than NMEs, including religious exemptions. *See Lowe*, 68 F.4th at 715. *See also* Blaisdell Dec. ¶ 25 (noting association between religious and philosophical exemptions).

Second, Plaintiffs note that the statewide percentage of students claiming religious exemptions was less than the statewide percentage of students claiming philosophical exemptions. TRO/PI at 15. But statewide averages do not tell the whole story. An outbreak can occur when a communicable disease is introduced into a community with insufficient vaccination rates or within a vaccinated community with spatial clusters of unvaccinated persons. Blaisdell ¶ 9. Data received by Maine CDC for the 2018-2019 school year evidence such clusters, showing that 13 out of 341 schools with kindergarten students reported religious exemption rates of greater than 5%. Shiminski Dec. ¶ 39. Further, to the extent that Plaintiffs claim that Maine should have eliminated only the philosophical exemption, that ignores the example of Vermont discussed above. *See* Blaisdell Dec. ¶¶ 25-26.

Third, Plaintiffs point out that the statewide average of missing records historically has exceeded the statewide average of religious exemptions, which they claim shows that Maine permits secular conduct that undermines the State interests. TRO/PI at 15, 17. But Plaintiffs assume that the missing records are acceptable to the State; they are not. Missing records reflect impermissible non-compliance with Maine's school vaccination laws, (unless schools have excluded students with missing records). Maine CDC and Maine DOE are making constant efforts to encourage voluntary compliance and to address noncompliance where it exists. *See* Shiminski Dec. ¶¶ 68-81. Moreover, when examined by vaccine and grade level, rates of missing records reflect the time it takes for medical providers, families, and schools to adjust to and follow the change in the Immunization Rule. Maine first implemented the requirement for seventh and twelfth graders to be immunized with meningococcal vaccine, MenACWY or MCV4, in the 2018-

2019 school year. Shiminski Dec. ¶ 62. Though declining over time (from 10.2% during the first year of the requirement to 3.1% in the 2024-2025 school year from twelfth graders), the rate of missing records is higher for the MenACWY vaccine than for any other required immunization. *See* Exs. 7-10. Plaintiffs' reliance on aggregate data masks that many students are missing records for just one vaccine. Shiminski Dec. ¶ 67

Fourth, Plaintiffs argue that the current IEP sunset provision exempts more students than the religious exemption ever did, TRO/PI at 16, but that argument is belied by the actual numbers of students (not percentages) included in opposition to this motion. *See* Shiminski Dec. ¶¶ 30-35.

Fifth, Plaintiffs claim that the increase in medical exemptions from the 2020-2021 school year to the 2021-2022 school year "confirms that these categories represent substitutes rather than distinct risks." TRO/PI at 16. But it makes complete sense that the number of medical exemptions would increase in the first school year after the elimination of nonmedical exemptions. Although parents had time to bring their children into compliance, many vaccines require multiple doses that must be spaced out over a period of months. Immunization Rule, § 5. In that circumstance, a student can utilize a temporary medical exemption while working to catch up on their required immunizations. In 2021, Maine CDC reporting combined temporary medical exemptions along with all other medical exemptions collectively in one figure. Shiminski Dec. ¶ 31. So an increase in the medical exemption is a natural consequence in the change in the law, *see* Blaisdell Dec. ¶¶ 21, 28, which is further supported by the subsequent decline and stabilization in the statewide and countywide medical exemption rates in later years. Shiminski Dec. ¶¶ 55-61; *see also* TRO/PI Exs. E-H (ECF Nos. 18-5 to 18-8).

Finally, Plaintiffs' attempts to analogize the present motion to *Fox v. Makin*, No. 2:22-cv-00251-JAW (D. Me.), and alleged "concessions" by the Commissioner in that case are without merit. TRO/PI at 12. The *Fox* decision cited was decided upon a motion to dismiss, which meant

all reasonable inferences were drawn in the plaintiff's favor—a standard inapplicable here. Second, statements made by counsel are not evidence. *See Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 704 n.5 (1st Cir. 1979) ("There were some statements made at oral argument about renting the farm, but this, of course, is not evidence."). None of Plaintiffs' arguments undercut the analysis above in Section I.A.1, and the Court should conclude that Maine's school vaccination laws are generally applicable.

**B. Maine's school entry vaccination law is neutral because it does not refer to or otherwise show hostility toward religion, and because it draws a religiously neutral distinction on the basis IEP status.**

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533, 141 S.Ct. 1868, 210 L.Ed.2d 137 (2021). "To fail the neutrality prong, it is not enough for a law to simply affect religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 145 (2d Cir. 2023). Here, Plaintiffs argue that section 6355 is 1) not facially neutral and 2) it singles out religious practices for less favorable treatment. Neither argument has merit.

"A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). Maine's school vaccination requirements do not refer to religious practice, conduct, belief, or motivation. *See* 20-A. M.R.S.A. § 6355. As Plaintiffs point out, TRO/PI at 17-19, the IEP sunset provision, section 6355(4), does continue to allow for religious and philosophical exemptions for some students, but those students must have had IEPs in place on September 1, 2021. However, the provision distinguishes only based on whether a student had an IEP in place, and it does not demonstrate any hostility to religion. *See We The Patriots*, 76 F.4th at 149 ("the Supreme Court has used a consistent cluster of terms to describe

the kind of official attitude that violates the neutrality prong of *Smith* -- "hostility," "animosity," "distrust," "a negative normative evaluation."). And, even laws that provide religious exemptions have been upheld as facially neutral. *See e.g., Tingley v. Ferguson*, 47 F.4th 1055, 1064-65 & 1088-89 (9th Cir. 2022) (concluding law prohibiting conversion therapy on minors with an exception for religious counselors was facially neutral).

The Second Circuit recently held that a sunsetting provision for religious exemptions broader than the one for students with IEPs is a neutral law of general applicability. *We The Patriots*, 76 F.4th at 148-50. While maintaining a medical exemption, Connecticut eliminated the religious exemption to its school vaccination requirements, except for all legacy students in kindergarten to grade twelve with existing religious exemptions. *See* 2021 Conn. Legis. Serv. P.A. 21-6 (Westlaw). Parents of incoming students who wanted to claim a religious exemption for their children filed suit, claiming the new law violated their Free Exercise rights. *See We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 579 F. Supp. 3d 290, 298 (D. Conn. 2022). Upon Connecticut's motion to dismiss, the court analyzed the Free Exercise claim and concluded Connecticut's mandatory vaccination laws were neutral. *See id.* at 306-07 (dismissing Free Exercise challenge to mandatory school vaccination law with medical exemption and religious exemption sunset pursuant to Rule 12(b)(6)). The Second Circuit affirmed, closely examining the debate by legislators for any animus, and concluding the legacy provision was neutral. *We The Patriots*, 76 F.4th at 148-50. This Court should likewise conclude that Maine's law, which also allows for a smaller subset of students to continue utilizing non-medical exemptions (subject to a sunset), is religiously neutral.

Plaintiffs' argument that section 6355 draws a non-neutral religious classification because the IEP sunset provision is allegedly only available to those who have previously exercised a religious right, TRO/PI at 18, mischaracterizes the function of the IEP sunset provision. Plaintiffs'

argument elides the core purpose of Chapter 154, which was to foreclose religious and philosophical exemptions. Recognizing that eliminating the religious and philosophical exemptions could raise unique procedural complexities with respect to students with IEPs, it did so only with respect to new exemptions for such students, allowing existing exemptions to sunset over time. For students without IEPs, Chapter 154 foreclosed religious and philosophical exemptions entirely. The ultimate result in both cases is identical: elimination of philosophical and religious exemptions. For these reasons, Plaintiffs' reliance on *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136 (1987) is inapposite. The applicability of the IEP sunset provision does not turn on how long a person has held a belief, but rather whether the child had an existing IEP and had claimed philosophical or religious exemption on September 1, 2021, at the time the Legislature decided to end such exemptions. *See also Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) (Gorsuch, J.) ("Surely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price." ).

**C. Maine's mandatory school vaccine laws do not implicate the Free Exercise interest at issue in *Yoder*, *Mahmoud*, and *Mirabelli*.**

Plaintiffs claim that Maine's school vaccination laws "'substantially interfer[e] with the religious development'" of Childs' son," and that means those laws are automatically subject to strict scrutiny. TRO/PI at 3-11 (quoting *Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025)). But that stretches *Yoder v. Wisconsin*, 406 U.S. 205 (1972), *Mahmoud*, 606 U.S. 522, and *Mirabelli v. Bonta*, 607 U.S. 492 (2026), too far. As the Second Circuit and the Fourth Circuit have properly held, the burden on parents' Free Exercise rights addressed in *Yoder*, *Mahmoud*, and *Mirabelli* is not of the same character as the burden imposed by mandatory school vaccination laws. *Miller v.*

*MacDonald*, 180 F.4th 420, 432-34 (2d Cir. 2026); *Perry v. Marteney*¸172 F.4th 315, 327 (2026). Indeed, since *Mahmoud* was decided, no reported decision has concluded that the *Yoder* interest includes a parents' decision to decline mandated school entry vaccinations for their children on religious grounds.[12]

**1. The interest at issue in *Yoder*, *Mahmoud*, and *Mirabelli.***

What binds *Yoder*, *Mahmoud,* and *Mirabelli* together is that in each case, parents challenged a school-based curriculum or other practice that was implemented over a period of time in school, during the school year, and during class time and other school hours that substantially interfered with the parents' ability to raise their children in accordance with their religious beliefs. *Yoder*, 406 U.S. at 219; *Mahmoud*, 606 U.S. at 550; *Mirabelli*, 607 U.S. at 496. *But cf. Doe No. 1 v. Bethel Loal School Dist. Bd. of Ed.*, 2025 WL 2453836, at *6-7 (6th Cir. Aug. 26, 2025) (concluding *Yoder* and *Mahmoud* were limited to compelled participation in educational requirements or curricula features and did not apply to school bathroom policies).

*Yoder* addressed Wisconsin's compulsory education law, which required children to attend school up to age 16. Because of their beliefs, Amish parents refused to send their children to high school in Wisconsin because "their children's attendance at high school, public or private, was

[12] *Miller*, 180 F.4th at 432-33; *Perry*, 172 F.4th at 327; *Children's Health Defense v. McDonald*, No. 25-CV-6877 (JMA) (AYS), 2026 WL 2445387, at *3 (E.D.N.Y. Aug. 20, 2026) (denying preliminary injunction motion challenging New York's school vaccination requirements, reasoning the burden imposed was not of the same character as the burden in *Yoder* or *Mahmoud*); *Doe v. McDonald*, No. 26-CV-4176 (KMK), 2026 WL 2005977, at *1 (S.D.N.Y. July 10, 2026) (same); *Grimsby v. Pan*, No. 5:25-CV-01575-AB-JC, 2025 WL 2829502, at *6 (C.D. Cal. Aug. 29, 2025) ("The vaccine mandate here is not comparable to the kind of educational instruction that was directly contrary to the religious teachings of the *Mahmoud* plaintiffs: it a public health mandate, it is not instruction and does not compel any curriculum or viewpoint, nor does it permit discretionary exemptions."); *Milford Christian Church v. Bye*, No. 3:23-CV-0304 (VAB), 2025 WL 2300788, at *8 n.2 (D. Conn. Aug. 8, 2025) (declining to extend *Mahmoud* and *Yoder* to vaccine requirements in preschools and daycares and dismissing Free Exercise claim); *cf. Kondilis v. City of Chicago*, 160 F.4th 866, 872 n.4 (7th Cir. 2025), *cert. denied*, 146 S. Ct. 1838 (2026) (noting objection to COVID-19 vaccination registry "is not like *Yoder* or *Mahmoud*, both of which involved compulsory school programs that infringed on parents' fundamental right to direct the education of their children").

contrary to the Amish religion and way of life." 406 U.S. at 207, 209. The parents were "charged, tried, and convicted of violating the compulsory-attendance law" and "were fined the sum of $5 each." *Id.* at 208. On appeal, the Wisconsin Supreme Court vacated the convictions on Free Exercise grounds, *id.* at 213, and the Supreme Court affirmed, *id.* at 236.

The Supreme Court acknowledged the State's strong interest in universal compulsory education but concluded that "compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practice as they exist today." 406 U.S. at 218. Whereas high school "tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students," the Amish faith and community "emphasizes informal learning-through-doing; a life of 'goodness,' rather than a life of intellect; wisdom, rather than technical knowledge, community welfare, rather than competition; and separation from, rather than integration with, contemporary worldly society." *Id.* at 211. Because of the nature of the First Amendment burden, i.e., government policies that "substantially interfer[e] with the religious development" of the Amish children at issue, *id.*, the Court applied strict scrutiny to Wisconsin's law, concluding that the State's asserted interests in compulsory education until age 16 were important, but not compelling based on the record presented.[13] *Id.* at 221-29.

*Mahmoud* likewise addressed the subject of public-school practices or curriculum that were alleged to interfere with the religious upbringing of children. Parents challenged the inclusion of five "LGBTQ+-inclusive" books in the curriculum of a Maryland elementary school for grades

[13] *Yoder* was decided before *Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990), which announced that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879 (cleaned up). Accordingly, such laws are subject to rational basis review. *Mills*, 16 F.4th at 29.

kindergarten through fifth grade. *Mahmoud*, 606 U.S. at 528, 533. The five books addressed, among other topics, gay relationships, gay marriage, preferred pronouns, and transgender identity. *See id.* at 533-35 (describing the contents of the books at issue). The books were to be incorporated into lessons, with recommended discussion points of how to respond to questions that "encouraged teachers to '[d]isrupt the either/or thinking' of their students." *See id.* at 535-36.

Several parents then filed suit challenging the curriculum and the lack of an opt-out policy and sought preliminary injunctive relief. at 540-542. The parents were of varying faiths, but all alleged that their religious beliefs, and the religious beliefs they were instilling in their children, were at odds with the message and instruction of the LGBTQ+-inclusive books. *Id.* Relying on *Yoder*, the parents also alleged that classroom instruction on the books would interfere, undermine, or conflict with their efforts to raise their children in accordance with their respective faiths. *Id.* The district court denied the parents' preliminary injunction motion. *Mahmoud*, 606 U.S. at 544. "A divided panel of the Fourth Circuit affirmed." *Id.*

The Supreme Court, however, reversed. *Id.* at 570. Stressing that the Free Exercise Clause protects the "rights of parents to direct the religious upbringing of their children," *id.* at 547 (quotation marks omitted), the Court held that the use of the five LGBTQ+ books in the public school curriculum without an opt-out "substantially interferes" with the "religious development" of the objecting parents' children, *id.* at 550. *Mahmoud* reiterated that the First Amendment Free Exercise interest protected by *Yoder* is one that places children in "'an environment hostile to'" the parents' religious "'beliefs,' where they would face 'pressure to conform' to contrary viewpoints and lifestyles." *Id.* (quoting *Yoder*, 406 U.S. at 211). The LGBTQ+ books at issue "present[ed] the opposite viewpoint" from the parents' beliefs "to young, impressionable children who are likely to accept without question any moral messages conveyed by their teachers' instruction." 606 U.S. at 551. The nature of the burden, which was the same as in *Yoder*, dictated

the application of strict scrutiny to the district policy. *Id.* at 564-65. Because the policy was not narrowly tailored, the Supreme Court reversed the Fourth Circuit decision and remanded for entry of a preliminary injunction based on *Yoder*. *Id.* at 530, 567, 570.

Finally, *Mirabelli*, which was not a decision from the Supreme Court's merits docket, addressed California policies that 1) prohibited schools from telling parents about their children's school-based gender transitioning efforts absent consent from the child, and 2) required schools to "use children's preferred names and pronouns regardless of their parents' wishes." 607 U.S. at 493. In a class action, parents and teachers challenged the policies on Free Exercise and Fourteenth Amendment substantive Due Process grounds. Representative plaintiff parents had religious and other objections to gender transition and children who had socially transitioned at school, but were not informed that their child had socially transitioned. *Id.* at 493-94; *see also id.* at 494 (describing one school's refusal to stop using a child's preferred pronouns upon parental request and another school's refusal to disclose the social transitioning and pronoun use another child). The district court granted summary judgment for plaintiffs and entered a permanent injunction in their favor; the Ninth Circuit stayed the injunction pending appeal; and the Supreme Court vacated the stay as to the parents only. *Id.* at 496-96.

The Supreme Court concluded that the parents were likely to succeed on the merits of their Free Exercise and substantive Due Process claims on appeal. *Id*. at 496-97. The parents claiming that their free exercise rights were being violated had "sincere religious beliefs about sex and gender, and they feel a religious obligation to raise their children in accordance with those beliefs." *Id.* at 496. But the California school policies denied parents access to critical information about their children's conduct in school and countermanded express parental instructions regarding their children. The policies thus prevented parents from raising their children in accordance with their religious beliefs, imposing the same burden on religious exercise as in *Yoder*. *Id.* at 496 (citing

*Mahmoud*, 606 U.S. 522, and *Yoder*, 406 U.S. 205).

**2. Maine's mandatory school vaccination laws do not implicate Mr. Childs' right to control the religious upbringing of his son.**

Like New York and West Virginia's laws, Maine's mandatory school vaccination laws do not implicate the interest at issue in *Yoder*. Unlike the school curricula in *Yoder* and *Mahmoud*, and the school policies in *Mirabelli*, Maine's vaccination laws are school entry requirements implemented by parents almost entirely <u>outside</u> of school, at medical offices, while children are in parents' custody and control. There is no "pressure to conform" as in *Yoder* or "hostile environment" as in *Mahmoud*. As the Second Circuit recently explained, a state's mandatory school vaccination law "does not regulate what children are taught, does not require them to affirm any belief, does not expose them to state-selected instruction contrary to their parents' faith, and does not enlist school officials to displace parental religious formation." *Miller*, 180 F.4th at 432-33. In other words, vaccination requirements are "public health measure[s]," not "instrument[]s of ideological indoctrination." *Perry*, 172 F.4th at 327. Accordingly, while vaccination is required for school entry, it does not implicate children's religious development in the same way as the laws and policies at issue in *Yoder* and *Mahmoud*.

Plaintiffs' arguments to the contrary are unpersuasive. Plaintiffs first argue that the "mechanism of interference is the same as in *Mahmoud*" and the "character of that interference is identical to *Mahmoud*'s." TRO/PI at 5-7. But that argument fails to address the significant differences between vaccination and the in-school instruction and policies at issue in *Mahmoud*. The parents in *Mahmoud* were concerned, *inter alia*, that exposing "young, impressionable, elementary-aged son to a curriculum that undermines Islamic teaching" "would be immoral," 606 U.S. at 540 (cleaned up); that "an ideological view of family life and sexuality that characterizes any divergent beliefs as hurtful" "will undermine their efforts to raise their children in accordance

with their religious faith," *id.* at 542 (cleaned up); and that allowing trusted "teachers to teach principles about sexuality or gender identity that conflict with their religious beliefs would significantly interfere with their ability to form their son's religious faith and religious outlook on life," *id.* (cleaned up). Here, however, vaccination does not take place in schools, nor do teachers instruct children regarding vaccination in schools. *Mahmoud* emphasized that the interference with children's religious development that triggered strict scrutiny was the presentment of "certain values and beliefs" that were "reinforced in the public school classroom" that "undermined" the "moral message" parents wished to present "to their children." 606 U.S. at 550, 552; *see also Mirabelli*, 607 U.S. at 496. Nothing like that occurs with school vaccination requirements.

Next, Plaintiffs emphasize that the burden on Mr. Childs' Free Exercise rights here is direct, likening vaccination to the mandatory salutation of the American flag in *West Virginia Board. of Education v. Barnette*, 319 U.S. 624 (1943). TRO/PI at 7-9. Plaintiffs claim that the Maine's school vaccination requirements compel and coerce Mr. Childs to act contrary to his religious beliefs, TRO/PI at 8, and that the only alternative available to him—home-schooling—was rejected as an option by *Mahmoud*, TRO/PI at 9.

But all of those arguments only go to whether Mr. Childs' rights are burdened; not the interest alleged to be burdened. The Second Circuit correctly addressed and rejected a similar argument in a case challenging New York's school vaccination laws. *See Miller*, 180 F.4th at 433. *Miller* explained: "that argument measures the wrong thing. *Mahmoud* asks whether a burden is 'of the same character as the burden in *Yoder*, not whether it is more or less serious. A greater burden in degree is not necessarily the same burden in kind." *Miller*, 180 F.4th at 433 (citation omitted). Plaintiffs also allege that the degree of burden is greater here than in *Mahmoud* and *Mirabelli*, TRO/PI at 10, but it is the nature of the burden that triggers strict scrutiny, not the degree of the burden, *Miller*, 180 F.4th at 433.

Finally, Plaintiffs' attempts to sidestep *Miller* and *Perry* are flawed. The interest at issue in *Yoder* was one that affected only the children and their parents; the school district would continue to teach other high school students, even if Amish students no longer attended. Similarly, *Mahmoud* and *Mirabelli* required exceptions to school-based policies that did not affect the health, education, or conduct of non-objecting parents or their children. The same cannot be said of vaccination policies, which are in place to protect schoolchildren and the community at large; exemptions from those polices do affect other children. Indeed, *Yoder* explicitly referenced this distinction, noting it was not a case "in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." *Id.* at 230 (citing *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963)).

When "conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order," "the [Supreme] Court has rejected challenges under the Free Exercise Clause," even though those acts were "prompted by religious beliefs or principles." *Sherbert*, 374 U.S. at 403 (relying in part on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)). Thus, "'even when the action is in accord with one's religious convictions, (it) is not totally free from legislative restrictions.'" *Id.* (quoting *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961)). The same holds here.

**D. Because Maine's mandatory school vaccination laws are neutral and generally applicable, the applicable standard of constitutional review is rational basis.**

As neutral laws of general applicability, Maines' school vaccination laws need only be "rationally related to a legitimate governmental interest." *Mills*, 16 F.4th at 29. Plaintiffs concede that "Defendants will likely prevail" under rational basis review, TRO/PI at 3, and with good reason. Protecting the health and safety of Maine students and the broader public, including vulnerable persons, from vaccine preventable diseases are unquestionably legitimate state

interests. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353-54 (4th Cir. 2011) (holding States have a clear, compelling interest in preventing the spread of communicable diseases even when there is no ongoing pandemic and when those diseases are not prevalent), *cert. denied*, 565 U.S. 1036 (2011). Requiring vaccination, the most effective method of preventing the spread of communicable disease, *see* Benowitz Dec. ¶ 16; Blaisdell Dec. ¶¶ 9-13, is rationally related to achieving that goal. *See Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (upholding municipality's mandatory vaccination law based on its "real or substantial relation" to protecting public health).

The medical exemption ensures medically vulnerable populations are not injured by vaccination, which would defeat the State's public health goals. *See* Benowitz Dec. ¶ 22. The IEP exemption, that allows students with IEPs in place prior to September 1, 2021, who previously claimed a religious or philosophical exemption to remain in school unvaccinated "is rationally related because it accommodates religious believers" whose children with disabilities "are already in school without extending that accommodation to younger children." *We The Patriots*, 76 F.4th at 156. Finally, the use of a one-time 90-day grace period is rationally related to the State's interest as it allows families to get their children vaccinated and respects the reality of the Immunization Rule's requirements of multiple doses with a minimum amount of time between doses, while also ensuring that parents commit to that course of conduct.

### E. Maine's school entry vaccination laws are narrowly tailored to achieve the State's compelling interests.

As shown, because Maine's school vaccination laws are neutral and generally applicable, they "need not be justified by a compelling governmental interest even if the law[s] ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. But if strict scrutiny were to apply, then Maine's mandatory school entry vaccinations laws would still

withstand constitutional scrutiny.

A "state's wish to prevent the spread of communicable diseases" in schools or elsewhere "clearly constitutes a compelling interest," *Workman*, 419 F. App'x at 353, and the laws challenged here are narrowly tailored to serve its objective. Narrow tailoring requires the government to show that its policy is the "least restrictive means" of achieving its objective, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981), and that it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). To evaluate the requirement of narrow tailoring, "the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

The Legislature considered repealing only the philosophical exemption, and not the religious exemption, to school entry vaccine requirements during the debate on Chapter 154.[14] But that would not have been an effective alternative to achieving Maine's goals. Non-medical exemption rates have been steadily increasing across the country, even in states that only offer religious exemptions. Blaisdell Dec. ¶ 26. Likewise, eliminating the medical exemption would have been an ineffective way of achieving Maine's goal of protecting the health of Maine students. Blaisdell Dec. ¶ 19, Benowitz Dec. ¶¶ 21-22.

Further, the Maine Legislature was aware of what occurred when Vermont eliminated its philosophical exemption in 2016.[15] Approximately two-thirds of the students who had claimed religious exemptions in the 2015-2016 year shifted to a religious exemption the following year.

---

[14] *See* Sen. Amend. A to L.D. 798, No. S-66 (129th Legis. 2009) (proposing to eliminate only philosophical exemption to Maine's school vaccination laws), *available at* https://lldc.mainelegislature.org/Open/LDs/129/129-LD-0798-CA_A-SA_A_S66.pdf.

[15] S. Leg. Rec. S-563 (1st Reg. Sess. 2019) (statements of Sen. Millett) (noting 400% increase in number of religious exemptions claimed after Vermont eliminated its philosophical exemption).

Blaisdell Dec. ¶ 25, Tbl. 2. Dozens of schools in Maine reported philosophical exemption rates of 10% or higher in the 2018-2019 school year. Blaisdell Dec. ¶ 24. Simply repealing the religious exemption would not have been an effective alternative if two-thirds shifted to a religious exemption because of the very high rates of philosophical exemptions in Maine schools.

The State's elimination of nonmedical exemptions is narrowly drawn to achieve the State's interests, and, just like West Virginia's mandatory school vaccination statute, survives strict scrutiny review. *See Workman*, 419 F. App'x at 352-54 (concluding West Virginia's mandatory vaccination law that allowed for only medical exemptions withstood strict scrutiny review); *cf. Phillips v. City of New York*, 775 F.3d 538, 543-44 (2d Cir. 2015) ("mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause").

**II. Plaintiffs are unlikely to succeed on the merits of their Establishment Clause Claim.**

The Establishment Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Everson v. Board of Educ.,* 330 U.S. 1, 8 (1947), provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. The Establishment Clause bars the government from officially favoring one religious denomination over another, *Larson v. Valente*, 456 U.S. 228, 244 (1982), or making "a religious observance compulsory," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (cleaned up). When assessing whether the Establishment Clause has been violated, courts begin with the "premise that the Establishment Clause is offended whenever a 'reasonable observer' could conclude that the government has 'endorse[d]' religion." *Kennedy*, 597 U.S. at 533 (internal citations omitted). In conducting this analysis, courts look to "'historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014). If a state law "establishes a denominational preference," courts must apply strict scrutiny. *Cath. Charities*

*Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025) (citing *Larson*, 456 U.S. at 244-246).

Plaintiffs' Establishment Clause challenge fails on its face because 20-A M.R.S. § 6355(4) neither favors one religious denomination over another nor endorses religion. Plaintiffs concede that section 6355 draws no distinction between religions or religious practices, TRO/PI at 21, but argue that the IEP sunset provision categorically excludes "the convert, the family whose child was born or reached school age [after September 1, 2021], and the family that moved to Maine afterward," TRO/PI Mot at 21. *Id.* Addressing this argument in the context of Connecticut's immunization requirements for preschool children, the District of Connecticut recently concluded that the availability of a "legacy" provision that allowed existing religious exemptions to continue while barring new ones "does not classify individuals based on religion, denomination, or belief, but instead distinguishes based on a cutoff date." *Milford Christian Church v. Bye*, No. 3:23-CV-0304 (VAB), 2025 WL 2300788, at *10 (D. Conn. Aug. 8, 2025), *appeal docketed,* No. 25-1955 (2d Cir. Aug. 13, 2025). As with Connecticut's legacy provision, the IEP sunset provision operates neutrally among different faiths; regardless of denomination, it bars new religious (and philosophical) exemptions.

Plaintiffs cite *Larson* to argue that when government accommodates some religious believers through an exception to a law, it must accommodate all religious believers. TRO/PI at 20. But *Larson* concerned a statute that "clearly grant[ed] denominational preferences[.]" 456 U.S. at 246. As Plaintiffs concede, no such preference exists in Section 6355. *See* TRO/PI at 21. And Plaintiffs cite no authority for extending *Larson* to require a state that has granted a religious accommodation in the past to retain that accommodation indefinitely. *Cf. Yellowbear*, 741 F.3d at 58.

*Board of Education of Kiryas Joel Village School District. v. Grumet*, 512 U.S. 687 (1994), is also inapposite. The case concerned a statute that created a unique school district for a religious enclave of practitioners of a strict form of Judaism. Because the religious enclave did not obtain its special status "simply as one of many communities eligible for equal treatment under a general law, [the Court had] no assurance that the next similarly situated group seeking a school district of its own w[ould] receive one." 512 U.S. at 703 (cleaned up) (footnote omitted). Moreover, unlike denial of an exemption from a generally applicable law, "a legislature's failure to enact a special law is itself unreviewable." *Id.* None of these defects are present in the instant case.

**III. Even if Plaintiffs had established a likelihood of success on the merits, the remaining factors support denying injunctive relief.**

Plaintiffs have not established irreparable harm, that the balance of hardships tips in their favor, or that the public interest warrants an injunction.

As to irreparable harm, Plaintiffs claim that the loss of their First Amendment rights, even for minimal periods of time, constitutes irreparable injury. TRO/PI at 26-27. But Plaintiffs will suffer no such injury because Maine's school vaccination laws do not impose an impermissible burden on Plaintiffs' Free Exercise rights. *See Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944)) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.").

Moreover, Plaintiffs sat on their rights. Any "cries of urgency are sharply undercut by [Plaintiffs'] own rather leisurely approach to the question of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Plaintiff Childs has been aware of the conflict with the District for well over a year. *See* Medd Dec. ¶¶ 10-20; ECF Nos. 27 to 27-6. Even after filing their complaint on July 16, 2026, Plaintiffs waited nearly 4 weeks before filing their motion for injunctive relief. ECF No. 18. "[D]elay between the

institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm." *Charlesbank Equity Fund II*, 370 F.3d at 163.

With respect to the balance of harms, the Commissioner seeks to protect the health of students across the State and the community as a whole. "[T]he elimination of communicable diseases through vaccination" is "one of the greatest achievements of public health in the 20th century," *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 226 (2011) (quotation marks omitted), and mandatory vaccination "has long been recognized as the gold standard for preventing the spread of contagious diseases." *Brown v. Smith*, 235 Cal. Rptr. 3d 218, 226 (Cal. Ct. App. 2018) (holding mandatory school vaccination law with medical and IEP exemptions did not violate free exercise clause under California Constitution).

Similarly, the public interest weighs heavily Defendants' favor. "Maine's interest in safeguarding its residents is paramount." *Mills*, 16 F.4th at 37. Vaccination not only provides direct individual protection from disease, it also provides essential indirect protection to individuals in the broader community. Blaisdell Dec. ¶ 7. Neither a temporary restraining order nor a preliminary injunction would serve the public interest. *See id.*

**CONCLUSION**

For the reasons set forth above, Commissioner Makin requests that Plaintiffs' motion be denied.

DATED: September 1, 2026

Respectfully submitted,

AARON M. FREY
Attorney General, State of Maine

*/s/ Kimberly L. Patwardhan*
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

KENDALL SCHUTZER
Assistant Attorney General
kendall.schutzer@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME 04333-0006
Tel. (207) 626-8800
Fax (207) 287-3145

*Counsel for Pender Makin*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2026, I electronically filed this document with its attachments with the Clerk of the Court using the CM/ECF system, and that the same will be sent electronically to registered participants as identified in the CM/ECF electronic filing system for this matter.

DATED: September 1, 2026

*/s/ Kimberly L. Patwardhan*
KIMBERLY L. PATWARDHAN
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta ME 04333-0006
Tel. (207) 626-8570
Fax (207) 287-3145
kimberly.patwardhan@maine.gov